IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

CHARYLENE WHITFIELD,

        Plaintiff,

    vs.                              No. CIV. 05-755 MCA/WPL

THE CATO CORPORATION, and
SARAH PRICE, Individually and as an
Employee of The Cato Corporation,

        Defendants.

MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court on Defendants' *Motion for Summary Judgment* [Doc. 30], filed May 15, 2006.  Having considered the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court grants the motion as to Counts I and II of Plaintiff's *Complaint for Damages* and declines to exercise supplemental jurisdiction over the state-law claim asserted in Count III.

## I. BACKGROUND

On July 11, 2005, Plaintiff Charylene Whitfield filed a *Complaint for Damages* against Defendants The Cato Corporation and Sarah Price, alleging retaliatory discharge in violation of 42 U.S.C. § 2000e *et seq.*, 42 U.S.C. § 1981, and the New Mexico Human Rights Act (Count I); racial discrimination in violation of 42 U.S.C. § 1981 (Count II); and breach of contract (Count III).  The following facts are taken from the *Complaint* or are

undisputed[1] by the parties and, thus, are accepted as true for purposes of Defendants' summary-judgment motion.

Charylene Whitfield is an African-American former employee of Defendant Cato Corporation ("Cato"), a Delaware corporation that operates women's apparel specialty stores in 31 states. Defendant Sarah Price is, like Whitfield, a former Cato employee. At all relevant times, both Whitfield and Price were employees of Cato, Whitfield as store manager of Cato's Rio Rancho, New Mexico store and Price as her district manager and immediate supervisor.

Whitfield became a Cato employee in August 2003. At or around that time, she signed an "Associate Acknowledgment Form" whereby she confirmed that she had read (or had been verbally informed of), understood, and agreed to comply with all company policies and procedures, including Cato's Disciplinary Guidelines ("the guidelines"). The guidelines treat insubordination (refusal to obey a proper order given by one's supervisor, assault on a supervisor, a violent physical attack) and fighting or provoking a fight (verbal or physical) as infractions punishable by discharge for the first offense. Use of profane, obscene, abusive, or offensive language is treated as an infraction punishable by written consultation and notice for the first two offenses and discharge for the third offense. The guidelines further caution that "[d]epending on the circumstances surrounding each situation, these Disciplinary Guidelines may progress at a faster or slower rate than listed above [and that]

---

[1] To the extent that facts recited herein are disputed, they are not substantively disputed but, rather, disputed as improperly proffered.

The Cato Corporation reserves the right to . . . discharge any Associate whose conduct or actions are deemed inappropriate and not in the best interest of the company." [Doc. 31; Exh. I, "Disciplinary Guidelines" at CATO 00016].

Problems between Whitfield and Price apparently developed during the summer of 2004. That is because on or about August 12 or 13, 2004, Whitfield reported to Eric Phillips, Regional Vice President and Price's immediate supervisor, and Terry Viands, Loss Prevention Supervisor, that she believed Price had violated Cato policies by (1) holding back merchandise for her own purchase, (2) receiving cash back on a credit card purchase, and (3) allowing family members into the store during off-hours. [See Doc. 31; Exh. E at 108-109]. Phillips counseled Price about the alleged violations in September 2004. Although Phillips did not tell Price who had lodged the complaint against her, Price may have had reason to suspect it was Whitfield.

On August 16, 2004, after Whitfield reported Price's alleged violations but before Phillips spoke to Price about the matter, Price issued Whitfield three written consultations for (1) failure to work her required weekly hours; (2) unacceptable "shrink" (inventory loss) results for the period ending July 20, 2004; and (3) receiving an unacceptable "secret shop" score of 46 on April 15 2004. [See id.; Exhs. K, L, M]. These consultations were issued at the direction of Phillips, who had informed Price in either late July or early August 2004 that despite Price's preference for handling such performance issues in a more informal manner, she needed to document them in writing.

3

The next incident between Price and Whitfield occurred some time in September.  At that time, Price and Whitfield were unpacking boxes of candles when Price allegedly picked up a brown candle and told Whitfield that Whitfield smelled like brown sugar.  Whitfield interpreted the comment as a racial slur.  [Doc. 34, Exh. 1, Jan. 18, 2006 depo. of Charylene Whitfield at 114-122].

A final incident occurred on October 1, 2004 when Price discovered that Whitfield, to whom she had assigned the task of working on the store's girls' wall, had reassigned the project to Cato associate Angela Rios.  After Price told Rios to stop working on the project, Whitfield confronted Price in the store's back room and a loud argument ensued.  During the argument, Whitfield used profanity and displayed hostile and offensive conduct toward Price.  At the close of business that day, Price told Whitfield that her earlier conduct was unacceptable and that she was never again to speak to another Cato associate in that manner.  Whitfield again became hostile and began shouting and, in an apparent attempt to threaten Price, refused to allow her to pass through the door to the room in which this incident was occurring.   Price then called Phillips to report that she and Whitfield "had gotten into a heated argument in the back room of the store, within earshot of shopping customers, and that [Whitfield] was very loud and out of control." [Doc. 31 at 8].  Phillips instructed Price to suspend Whitfield.  On October 21, 2004, Phillips came to Albuquerque to investigate the October 1st incident.  As part of his investigation, Phillips took written statements from Angela Rios and another Cato associate, Felicia Madrid.  Phillips also considered a written

statement that Price had prepared on October 1, 2004 for Cato's Human Resources ("HR")

Department.  Finally, Phillips reviewed a police report from August 22, 2004, documenting

Whitfield's arrest for battery against a household member.  [Doc. 31; Exh. A, May 11, 2006

affidavit of Eric Phillips].  Whitfield was terminated by Cato on or about October 25, 2004.

## II. ANALYSIS

### A. Summary Judgment Standard, Fed.R.Civ.P. 56

Summary judgment under Fed.R.Civ.P. 56(c) "shall be rendered forthwith if the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the

moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  "When a

motion for summary judgment is made and supported as provided in this rule, an adverse

party may not rest upon the mere allegations or denials of the adverse party's pleading. . . ."

Fed.R.Civ.P. 56(e).  Nor will unsupported conclusory allegations create a genuine issue of

fact.  Harrison v. Wahatoyas, L.L.C., 253 F.3d 552, 557 (10th Cir. 2001).  Rather, "the

adverse party's response . . . must set forth specific facts showing that there is a genuine

issue for trial."  Fed.R.Civ.P. 56(e).  Judgment is appropriate as a matter of law if the

nonmoving party has failed to make an adequate showing on an essential element of its case,

as to which it has the burden of proof at trial.  See Celotex Corp. v. Catrett, 477 U.S. 317,

322-23 (1986); Lopez v. LeMaster, 172 F.3d 756, 759 (10th Cir. 1999).

"At the summary judgment stage, evidence need not be submitted 'in a form that

5

would be admissible at trial.'"  <u>Argo v. Blue Cross and Blue Shield of Kansas, Inc.</u>, --- F.3d

----, 2006 WL 1806605, at *5 (10th Cir. 2006) (*quoting* <u>Celotex</u>, 477 U.S. at 324).  Rather,

because it is the substance or content of the evidence that must be admissible, "[p]arties may,

for example, submit affidavits in support of summary judgment, despite the fact that

affidavits are often inadmissible at trial as hearsay, on the theory that the evidence may

ultimately be presented at trial in an admissible form."  <u>Id.</u>  Additionally, it is not the Court's

role to weigh the evidence, assess the credibility of witnesses, or make factual findings in

ruling on a motion for summary judgment.  Rather, the Court assumes the evidence of the

non-moving party to be true, resolves all doubts against the moving party, construes all

evidence in the light most favorable to the non-moving party, and draws all reasonable

inferences in the non-moving party's favor.  <u>See</u> <u>Hunt v. Cromartie</u>, 526 U.S. 541, 551-52

(1999).

## **B. 42 U.S.C. § 2000e, *et seq.* (Title VII) and 42 U.S.C. § 1981 (Counts I and II)**

Title VII makes it unlawful for an employer to, among other things, "fail or refuse to

hire or to discharge any individual, or otherwise to discriminate against any individual with

respect to his compensation, terms, conditions, or privileges of employment, because of such

individual's race, color, religion, sex, or national origin . . . ."  42 U.S.C. § 2000e-2(a)(1).

Section 1981 likewise forbids all intentional racial discrimination in the making or

enforcement of private or public contracts and protects employees from racial discrimination

both in entering into an employment contract and in enjoying the benefits, privileges, terms

6

and conditions of employment.  See Exum v. U.S. Olympic Comm., 389 F.3d 1130, 1134

(10th Cir. 2004).  Regardless of which statutory theory she pursues,[2] the plaintiff carries the

initial burden of establishing a prima facie case of racial discrimination, which she may do

by showing that she (1) belongs to a protected class; (2) was qualified for the position at

issue; (3) suffered an adverse employment action;  and (4) was treated less favorably than

others (e.g., the position at issue remained open after the adverse employment action).

Exum, 389 F.3d at 1134 (§ 1981); see also Argo, 2006 WL 1806605, at *6.  If the plaintiff

demonstrates her prima facie case, the burden then shifts to the defendant/employer to

articulate some legitimate, nondiscriminatory reason for the challenged action.  McDonnell

Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  If the defendant/employer satisfies its

burden, the plaintiff must then demonstrate that the legitimate reason is merely a pretext for

racial discrimination.   See  Salguero v. City Of Clovis, 366 F.3d 1168, 1175 (10th Cir.

2004).  The plaintiff typically does so by demonstrating that (1) the defendant's stated reason

for the adverse employment action was false; (2) the defendant acted contrary to a written

company policy prescribing the action taken by the defendant under the circumstances; or

(3) the plaintiff was treated differently from other similarly situated employees who violated

work rules of comparable seriousness.  Id. at 1176; see also Kendrick v. Penske Transp.

Servs., Inc., 220 F.3d 1220, 1230 (10th Cir.2000).  The plaintiff may also establish pretext

---

[2]  Whitfield's Title VII argument appears to be that she was retaliated against for having
reported what she believed to be Price's policy violations, while her § 1981 claim stems from the
fact that her alleged contractual employment relationship with Cato was terminated on the basis
of her race.  [See Doc. 1 at 2-3].

by showing that the proffered reason for the defendant's action is so inconsistent, implausible, incoherent, or contradictory that it is unworthy of belief. <u>Miller v. Automobile Club Of New Mexico, Inc.</u>, 420 F.3d 1098, 1123 (10th Cir. 2005).

For purposes of Defendants' motion for summary judgment, this Court assumes without deciding that Whitfield has established her prima facie case. The Court next concludes, however, that Defendants have articulated a legitimate, nondiscriminatory reason for the termination, *i.e.*, that in light of all Phillips learned in the course of his investigation into the October 1st incident, it appeared that Whitfield was a threatening presence in the workplace. Finally, the Court determines that Whitfield has not demonstrated Defendant's given reason to be merely a pretext for racial discrimination.

### 1. Phillips's Investigation Into the October 1, 2004 Incident and the Decision to Terminate Whitfield

Through his deposition testimony, Eric Phillips explained that he, not Price, made the actual decision to terminate Whitfield. [Doc. 34; Exh. 6, Apr. 4, 2006 depo. of Eric Phillips at 9]. Phillips terminated Whitfield for (1) violating Cato's prohibition against provoking a verbal fight with another employee; (2) assaulting a co-worker; and (3) failing to obey a proper directive from a supervisor. He testified that he believed his decision to terminate Whitfield on the ground that she was a threatening presence was justified by what he learned in the course of his investigation into the incident, which included (1) an interview with Whitfield; (2) the written statements provided by Angela Rios and Felicia Madrid; (3) the statement that Price prepared for Cato's HR Department; and (4) the police report of August

8

22, 2004.[3]

Madrid actually provided two statements, the first dated October 4, 2004 and the second dated October 21, 2004.  In both, Madrid asked that her statements be kept confidential from Whitfield "for fear of retaliation or any harm against me[,]" "for safety for myself and others[,]" [Doc. 30; Exh. A1], and "for fear of retaliation or harm against myself and my family."  [Id.; Exh. A2].  Madrid then stated that in her 11 months with Cato, she felt afraid of, as well as threatened and abused by, Whitfield.  [Id.].  Madrid also stated that on October 1, 2004, while Price and Whitfield were in a storage room, Madrid could hear Whitfield yelling or raising her voice and using hand gestures toward Price, though she never heard Price.   [Id.].  According to Madrid, Whitfield told Madrid after the incident that "if she hadn't had prior battery charges, that she would have hit Price."  [Doc. 30; Exh. A1 at CATO 00096-97].  Madrid also stated that Whitfield had previously told her that Whitfield had "beat up" a police officer in Oklahoma, a boyfriend, and an ex-husband, and

---

[3]  The Court has considered Whitfield's argument that the statements of Madrid, Rios, and Price, as well as the August 22, 2004 police report, are improperly proffered and, for that reason, may not be relied on for purposes of resolving Defendants' summary-judgment motion. The Court rejects Whitfield's argument, however, in light of Tenth Circuit authority holding that, at the summary judgment stage, evidence need not be submitted in a form that would be admissible at trial, so long as the substance or content of that evidence would be admissible.  See Argo, 2006 WL 1806605, at *5.  In this case, Madrid, Rios, and Price are listed in the parties' *Initial Pretrial Order* as witnesses for both Whitfield and Defendants.  [See Doc. 15 at 5-6].  At trial, they could testify on matters as to which they have firsthand knowledge. Additionally, declarations allegedly made by Whitfield and reported in the written statements given by Madrid, Rios, and Madrid would be admissible as admissions by a party-opponent.  See Fed.R.Evid. 801(d)(2).  In any event, Defendants represent that the written statements of Madrid, Rios, and Price, as well as the August 22, 2004 police report, are offered not for the truth of the matter asserted but to show their effect on Phillips and demonstrate why he terminated Whitfield.  [Doc. 35 at 5].

had "even sent another person to the hospital."  [Doc. 30; Exh. A2 at CATO 0101].   Madrid

asked four separate times in her statements that they be kept confidential from Whitfield in

order to protect her (Madrid's) safety.

In her statement, Angela Rios told of having witnessed a loud incident between Price

and Whitfield, which appeared to have been sparked by Rios's attempt to work on the

store's girls' wall.   [Doc. 30; Exh. B (as attached to Exh. A)].   When Rios told Whitfield

that Price seemed upset about the reassignment of the project, Whitfield, who according to

Rios had become angry, confronted  Price in a back room.   Whitfield told Price that Price

thought she "walked on gold . . . and  . . . thought that the store was hers."   [Id. at CATO

00109].   Whitfield also informed Price that she did not want Price "telling her associate

anything . . . ."  [Id.].   Rios stated that the conversation between Whitfield and Price "grew

louder meaning [Whitfield]" so Rios closed the door to the back room because a customer

began looking in that direction.  [Id.].

In the statement she prepared for Cato's HR Department, Price explained that soon

after she told Angela Rios that the store's girls' wall was Whitfield's project, Whitfield came

into Price's office and "told [her] in a loud voice that she didn't appreciate [Price] telling

her girls how to do their job & that [Price] was not to speak to them, only to [Whitfield]."

[Doc. 30; Exh. C at CATO 00078].   Whitfield then began yelling and cursing, at which point

Rios came back to close the door.   Price told Whitfield that they would discuss the matter

later.   As Whitfield was leaving Price's office, she mentioned that she did not appreciate

Price's use of "racial overtones," a reference to Price's alleged "brown sugar" comment of September 2004. According to Price, she apologized but Whitfield began to curse again. Whitfield then returned to the sales floor.

Price stated that she left Whitfield alone for a few hours and called Eric Phillips to tell him what had happened. At about 6:00 p.m. that same day, Price and Whitfield stepped into a back room, at which point Price told Whitfield that she was never again to use her earlier tone or words with Price or any other Cato associate. According to Price, Whitfield again raised her voice and began cursing. When Price informed Whitfield that their conversation was over, she says Whitfield, who "was standing in between [Price] & the door . . . did not move until [Price] made the motion to leave. [Whitfield] stood & stared at [Price] like she was trying to intimidate [Price] for about 45 seconds." [Doc. 30; Exh. C at CATO 00079].

Finally, a police report of August 22, 2004, documenting Whitfield's arrest for domestic violence/battery against a household member, played a role in Phillips's decision to terminate Whitfield. [See Doc. 34; Exh. 6 at 33 ("I was more interested in getting a copy of the police report . . . where [Whitfield] had been involved in an incident with an argument, showing her temper[;]" see also Doc. 30; Exh. D (as attached to Exh. A), "State of New Mexico Uniform Incident Report"]. Phillips testified that the police report played a role in his decision because "[i]t show[ed] a violent past and present. Her temper inside the store shows that [Whitfield] obviously ha[d] anger issues. And I felt that the store

personnel, district manager included, were threatened." [Id.; Exh. 6 at 35].

Again, pursuant to Cato's guidelines, fighting or provoking a fight, whether verbal or physical, is grounds for immediate discharge. [See Doc. 30; Exh. I at CATO 00014]. When Whitfield was hired, she acknowledged in writing that she understood the guidelines. Phillips's decision to terminate Whitfield was based on his conclusion that Whitfield's behavior toward Price on October 1, 2004 was akin to provoking a verbal fight with another Cato employee. [See Doc. 30; Exh. A]. Before terminating Whitfield, Phillips solicited written statements from Price and two witnesses to the incident and considered a weeks-old police report documenting Whitfield's arrest for battery against a household member. He also met with Whitfield "to hear her side" about what had happened on October 1, 2004. [Doc. 34; Exh. 6 at 29]. It was on the basis of the information that he gathered that Phillips made the ultimate decision to terminate Whitfield, having come to the conclusion that Whitfield posed a threat to other Cato personnel.

In an effort to show pretext, Whitfield makes much of the fact that Defendants have provided a number of reasons—insubordination, poor performance, posing a threat to co-workers—for the decision to terminate. However, Whitfield has shown neither that Defendants' stated reasons for her termination are false, nor that Defendants acted contrary to a written company policy prescribing the action taken by the defendant under the circumstances. To the contrary, whether Whitfield was terminated for insubordination, poor performance, posing a threat to co-workers, or some combination thereof, Cato guidelines

specify discharge as a punishment for each of those infractions, state that the listed infractions are not the only infractions for which an employee may be terminated, and further caution that Cato "reserves the right to . . . discharge any Associate whose conduct or actions are deemed inappropriate and not in the best interest of the company." [Doc. 30; Exh. I at CATO 00016].

Nor has Whitfield shown that she was treated differently from other similarly situated employees who violated work rules of comparable seriousness.[4]  To the extent that Whitfield argues that pretext is demonstrated through Phillips's decision to terminate her but not Price, the other participant in the October 1st incident, Phillips explained that he "felt with the statements [he] had from the associates, they indicated it was [Whitfield] mainly who had overstepped her bounds and was much more aggressive in the conversation, that [Price] was only trying to calm her down." [Doc. 34; Exh. 6 at 64].  Indeed, in her statement, Angela Rios confirmed hearing the discussion between Price and Whitfield "gr[o]w louder meaning Char[,]" [Doc. 30; Exh. B (as attached to Exh. A) at CATO 00109], while Felicia Madrid stated that although she heard "[Whitfield] yelling or raising her voice . . . during this time [she] never heard [Price]."  [Doc. 30; Exh. A2 at CATO 00104].  The important

_____

[4] Inasmuch as Whitfield argues that Price also became loud during the October 1st incident but was not disciplined, the Court questions whether Whitfield, as store manager, and Price, as her supervisor, can even be considered similarly situated employees.  See Watts v. City of Norman, 270 F.3d 1288, 1293 (10th Cir. 2001) ("Under [Tenth Circuit] precedent, employees may not be 'similarly situated' when one is a supervisor and the other is not.").  Notwithstanding this concern, the Court analyzes the "similarly situated" test for pretext as if Price and Whitfield were similarly situated employees.

consideration in determining pretext here is Phillips's good faith belief in the allegations against Whitfield.  See McKnight v. Kimberly Clark Corp., 149 F.3d 1125, 1129 (10th Cir. 1998) ("The test is good faith belief.").  Thus, so long as Phillips believed the allegations against Whitfield and terminated Whitfield because of them, his articulated motivating reason for the discharge cannot be deemed pretextual.  See id.; accord Waggoner v. City of Garland, Tex., 987 F.2d 1160, 1165 (5th Cir. 1993) (explaining that where one employee is terminated on the basis of co-workers' complaints, the issue is whether the employer reasonably believed the co-workers' allegations and acted on them in good faith, or to the contrary, did not actually believe the allegations but instead used them as a pretext for an otherwise discriminatory dismissal).  Whitfield has presented no evidence that Phillips did not rely in good faith on the information gathered during his investigation in making the decision to terminate her.  Because Whitfield has not shown that Defendants' articulated legitimate reason for her termination is merely a pretext for racial discrimination, summary judgment will be entered for Defendants as to Counts I and II of the *Complaint*.

### C. Breach of Contract (Count III)

In Count III of her *Complaint*, Whitfield has asserted a claim for breach of contract. In asserting this claim, Whitfield invokes the Court's supplemental jurisdiction.  [See Doc. 15 at 2 ("The parties further stipulate and agree that the law governing this case is the substantive law of the state of New Mexico, 42 U.S.C. §§ 1981 and 1988.")].

Section 1367 of Title 28 of the United States Code provides, in pertinent part, that

14

"in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy . . . ." 28 U.S.C. § 1367(a).  Pursuant to subsection (c), however, the Court may decline to exercise its supplemental jurisdiction if, among other things, it has dismissed all claims over which it had original jurisdiction.  28 U.S.C. § 1367(c)(3).  In other words, once "the bases for federal subject matter jurisdiction have been extinguished[,] the district court may decline to exercise continuing 'pendent or supplemental jurisdiction over [the] plaintiff's state claims." Lancaster v. Indep. Sch. Dist. No. 5, 149 F.3d 1228, 1236 (10th Cir. 1998) (dismissing without prejudice plaintiff's claims for, *inter alia*, breach of contract after having entered summary for defendant on plaintiff's First and Fourteenth Amendment claims); see also Taylor v. Meacham, 82 F.3d 1556, 1564 n.1 (10th Cir. 1996) ("Once a federal court dismisses claims over which it has original jurisdiction, it may decline to exercise supplemental jurisdiction over related state law claims.").

    In the instant action, the entry of summary judgment in favor of Defendants on Counts I and II extinguishes the bases for federal subject matter jurisdiction.  See Lancaster, 149 F.3d at 1236.  Accordingly, the Court declines to exercise its supplemental jurisdiction over Whitfield's breach-of-contract claim.  See 28 U.S.C. § 1367(c)(3).  In so declining, the Court has considered whether the nature and extent of pretrial proceedings, judicial economy, convenience, and fairness would be served by retaining jurisdiction.  See

Anglemyer v. Hamilton County Hosp., 58 F.3d 533, 541 (10th Cir. 1995). The Court is not convinced that these factors weigh in favor of retaining jurisdiction. The employment policies that are at the heart of Whitfield's breach-of-contract claim are subject to evaluation under state law and, thus, best suited to adjudication in a state court. Notions of comity and federalism demand that a state court try such claims in the first instance, absent compelling reasons to the contrary. See Thatcher Enters. v. Cache County Corp., 902 F.2d 1472, 1478 (10th Cir. 1990). In addition, the Court's decision not to exercise supplemental jurisdiction is not necessarily fatal to Whitfield's state-law claim, as 28 U.S.C. § 1367(d) may provide for the tolling of any limitations period regarding this claim. For these reasons, Whitfield's claim for breach of contract will be dismissed without prejudice. See Lancaster, 149 F.3d at 1236 (where district court had entered summary judgment for defendant on plaintiff's federal claims, affirming district court's decision to dismiss without prejudice plaintiff's state-law claims).

## III. CONCLUSION

For the foregoing reasons, the Court grants Defendants' motion for summary judgment as to Counts I and II of Whitfield's *Complaint.* The Court declines to exercise its supplemental jurisdiction over Count III, which is hereby dismissed without prejudice.

**IT IS, THEREFORE, ORDERED** that Defendants' *Motion for Summary Judgment* [Doc. 30] is **GRANTED** as to Plaintiff Charylene Whitfield's claims for retaliatory discharge (Count I) and violations of 42 U.S.C. § 1981 (Count II);

**IT IS FURTHER ORDERED** that Plaintiff Charylene Whitfield's claim for retaliatory discharge (Count I) is **DISMISSED WITH PREJUDICE**;

**IT IS, THEREFORE, ORDERED** that Plaintiff Charylene Whitfield's claim for violations of 42 U.S.C. § 1981 (Count II) is **DISMISSED WITH PREJUDICE**;

**IT IS FURTHER ORDERED** that Plaintiff Charylene Whitfield's state-law claim for breach of contract (Count III) is **DISMISSED WITHOUT PREJUDICE;**

**IT IS FURTHER ORDERED** that the **PRETRIAL CONFERENCE** set for TUESDAY, September 5, 2006, at 9:00 a.m., the **CALL OF THE CALENDAR** set for THURSDAY, October 5, 2006, at 9:00 a.m., and the **JURY SELECTION/TRIAL** set for TUESDAY, October 10, 2006, at 9:00 a.m. are hereby **VACATED**.

**SO ORDERED** this 27th day of July, 2006, in Albuquerque, New Mexico.


_____
**M. CHRISTINA ARMIJO**
United States District Judge